UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

AMANDA R. VAUGHN,

              Plaintiff,

         v.

COMMISSIONER OF SOCIAL
SECURITY,[1]

              Defendant.

6:16-cv-02010-YY

OPINION AND ORDER

YOU, Magistrate Judge:

## INTRODUCTION

Plaintiff, Amanda R. Vaughn ("Vaughn"), seeks judicial review of the final decision by

the Commissioner of Social Security ("Commissioner") denying her applications for Disability

Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 USC §§ 401-

433, and Supplemental Security Income ("SSI") under Title XVI of the Act, 42 USC §§ 1381-

1383f.  This court has jurisdiction to review the Commissioner's decision pursuant to 42 USC §

---

[1]  The official title of the head of the Social Security Administration is the "Commissioner of
Social Security."  42 USC § 902(a)(1).  Nancy A. Berryhill is currently the Acting Commissioner
of Social Security.  However, a "public officer who sues or is sued in an official capacity may be
designated by official title rather than by name."  FRCP 17(d).

405(g) and § 1383(c)(3). All parties have consented to allow a Magistrate Judge to enter final orders and judgment in this case in accordance with FRCP 73 and 28 USC § 636(c) (ECF #6). For the reasons below, the Commissioner's decision is REVERSED and this case is REMANDED for the immediate calculation and payment of benefits.

### ADMINISTRATIVE HISTORY

In October 2011, Vaughn protectively filed for DIB and SSI alleging a disability onset date of January 24, 2011. Tr. 272-81.[2] She requested a hearing after her application was denied initially and on reconsideration. Tr. 178-97. On July 22, 2013, a hearing was held before Administrative Law Judge ("ALJ") Elizabeth Watson. Tr. 44-86. ALJ Watson issued a decision on August 21, 2013, finding Vaughn not disabled. Tr. 151-66. Vaughn requested review of the hearing decision, and the Appeals Council remanded the case for further proceedings on November 5, 2014. Tr. 172-75.

On December 15, 2015, a remand hearing was held before ALJ MaryKay Rauenzahn. Tr. 87-108. ALJ Rauenzahn issued a new decision finding Vaughn not disabled on March 3, 2016. Tr. 14-31. The Appeals Council denied a request for review on August 16, 2016. Tr. 1-3. Therefore, ALJ Rauenzahn's decision is the Commissioner's final decision subject to review by this court. 20 CFR §§ 404.981, 416.1481, 422.210.

### BACKGROUND

Born February 4, 1989, Vaughn was 21 years old on the alleged disability onset date, and 26 years old at the time of the second administrative hearing. Tr. 272. She graduated from high school and completed some college coursework but did not obtain a degree. Tr. 49, 302. She has no past relevant work that qualifies as substantial gainful activity, although she served as a

---

[2] Citations are to the page(s) of the official transcript filed March 31, 2017 (ECF #11).

youth recreational leader for the City of Eugene.  Tr. 29, 308-09.  Vaughn alleges disability due to fibromyalgia, neck problems, and back problems.  Tr. 301.

## STANDARD OF REVIEW

The reviewing court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record.  42 USC § 405(g); *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007).  This court must weigh the evidence that supports and detracts from the ALJ's conclusion and "'may not affirm simply by isolating a specific quantum of supporting evidence.'"  *Garrison v. Colvin*, 759 F.3d 995, 1009-10 (9th Cir. 2014) (quoting  *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007)).  The reviewing court may not substitute its judgment for that of the Commissioner when the evidence can reasonably support either affirming or reversing the decision.  *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007) (citation omitted).  Instead, where the evidence is susceptible to more than one rational interpretation, the Commissioner's decision must be upheld if it is "supported by inferences reasonably drawn from the record."  *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citation omitted); *see also Lingenfelter*, 504 F.3d at 1035.

## SEQUENTIAL ANALYSIS AND ALJ FINDINGS

Disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 USC § 423(d)(1)(A).  The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act.  This sequential analysis is set forth in Social Security Administration ("Agency") regulations, 20 CFR §§ 404.1520, 416.920, in Ninth Circuit case law, *Lounsburry v. Barnhart*, 468 F.3d 1111, 1114 (9th Cir. 2006)

(discussing *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999)), and in the ALJ's decision, Tr. 18-19.

At step one, the ALJ concluded Vaughn had not engaged in substantial gainful activity since January 24, 2011, the alleged onset date of disability. Tr. 20.

At step two, the ALJ determined that Vaughn has the following severe impairments: fibromyalgia, mild degenerative disc disease, post-traumatic stress disorder ("PTSD"), mood disorder, obesity, and asthma. *Id.*

At step three, the ALJ concluded Vaughn did not have an impairment or combination of impairments that met or equaled any listed impairment. *Id.*

The ALJ then found Vaughn has the residual functional capacity ("RFC") to perform less than the full range of light work, with the following limitations:

> [She] can lift and/or carry 20 pounds occasionally and 10 pounds frequently; she can stand and/or walk for six hours out of an eight-hour workday with regular breaks; she can sit for six hours out of an eight-hour workday with regular breaks; she should be allowed the freedom to perform work either sitting or standing as desired; she can frequently use foot controls bilaterally. . . [she] may occasionally climb stairs and ramps but never climb ladders, ropes and scaffolds. [She] may occasionally stoop, kneel, and crouch, but can never crawl. [She] may occasional[ly] reach overhead bilaterally. [She] must avoid concentrated exposure to extreme cold and atmospheric conditions and is precluded from exposure to workplace hazards such as unprotected heights and dangerous machinery. [She] is able to understand, remember and carry out simple instructions that can be learned in 30 days or less. [She] is unable to engage in conveyor belt paced work. [She] may have occasional public contact, but is precluded from working directly with the public. [She] may have occasional coworker contact, but is unable to perform group tasks.

Tr. 22.

The ALJ determined at step four that Vaughn had no past relevant work. Tr. 29. At step five, the ALJ found that considering Vaughn's age, education, and RFC, she was capable of

performing jobs as an electronics worker, information router, and assembler of electronics accessories. Tr. 29-30. Accordingly, the ALJ determined that Vaughn was not disabled at any time through the date of her decision. Tr. 30.

## MEDICAL EVIDENCE

In January 2011, Vaughn was seen at a hospital emergency department complaining of sudden neck pain caused by no particular injury. Tr. 401. A CT-scan showed a "congenital fusion of C7-T1," and she was prescribed Oxycodone and Flexeril. *Id.* On examination several weeks later, Donna Givens, M.D., noted near full rotation and flexion of the spine, tenderness to palpation over the trapezius muscles bilaterally and paraspinous soft tissues on the right side of the neck, but no point tenderness over the cervical spinous processes. *Id.* Dr. Givens assessed myofascial neck strain without concern for neurological compromise. *Id.* She referred Vaughn to physical therapy, approved her for light duty work, renewed her prescription for Flexeril, discontinued Oxycodone, and recommended she gradually resume normal activities. *Id.*

In March 2011, Vaughn reported no improvement with her neck pain and increasing low back pain. Tr. 399. On examination, Dr. Givens noted a negative straight leg test, normal strength and sensation, an "entirely normal" lumbar x-ray, and "essentially no tenderness over the lumbosacral spine," although Vaughn was noted as visibly crying by the end of the examination. *Id.* Based on Vaughn's presentation, Dr. Givens described that "her clinical picture has become more complex." *Id.* Dr. Givens prescribed Naproxen for daily pain management, Skelaxin for more severe pain, and continued to endorse physical therapy. *Id.*

In May 2011, Vaughn was seen by Christopher Noonan, M.D., for continued treatment of her back pain. Tr. 361-66. She reported a "burning pain" in her lower back with stiffness in her hips, pain levels ranging from three to ten out of ten, and the ability to stand for 15 minutes and walk a half-block at a time. Tr. 364-66. With the exception of some hyperreflexia, the physical

examination was largely unremarkable. Tr. 362. Dr. Noonan recommended an MRI, noting that Vaughn's pain "seem[ed] to be out of proportion to any findings." *Id.* A cervical MRI confirmed the congenital fusion at C7-T1, and revealed mild disc desiccation and slight degenerative change at C5-6. Tr. 359. Other than some mild disc desiccation at L5-S1, Vaughn's lumber MRI was also normal. *Id.* Dr. Noonan saw no need for surgical intervention, recommended Vaughn continue conservative treatment and exercise, and advised Vaughn to see a physiatrist if her pain continued. Tr. 359.

Dr. Noonan referred Vaughn to physiatrist Lisa Albanese, M.D., for assessment. Tr. 387-88. At an examination on June 27, 2011, Vaughn reported an average pain level of eight out of ten and difficulty concentrating, but no issues with memory. Tr. 387. Dr. Albanese noted significant tenderness to light palpation over the paraspinal musculature, tenderness in 13 of 18 tender points and all four quadrants of her body, difficulty with lumbar flexion and extension, and a positive Hoffman's test on the left. Tr. 388. Dr. Albanese diagnosed fibromyalgia, prescribed Cymbalta, and referred Vaughn to a pain psychologist. *Id*; *see also* Tr. 384.

At a follow-up appointment with Dr. Albanese on July 25, 2011, Vaughn reported that Cymbalta was helping with her pain, mood, and drive. Tr. 385. Her pain was slightly reduced, ranging from a three to eight out of ten. *Id.* Vaughn also inquired about joining Weight Watchers and swimming to help with her weight loss goals. *Id.* Dr. Albanese encouraged her to join Weight Watchers and to gradually ease into swimming, using her pain levels as a guide. *Id.*

A few days later, Vaughn underwent a comprehensive psychological evaluation with Terri Lechnyr, Ph.D. Tr. 422-28. She endorsed severe anxiety, moderate depression, and low-level coping strategies. Tr. 422. She further reported past suicide attempts and a history of physical and sexual abuse. *Id.* Vaughn rated her pain level as an eight out of ten, and reported

difficulty sleeping due to pain and recurring nightmares. Tr. 423. Vaughn described watching television for seven to eight hours a day, sitting for nine to ten hours a day, and practicing yoga at home for exercise. *Id*. On a typical morning, she would wake up late, take her medications, and visit with a neighbor. *Id*. In the afternoon, she would prepare lunch, watch television, clean her home in small portions, play with her kitten, and do some yoga. *Id*. In the evening, she would watch more television, eat dinner, and wait for her fiancé to get home from work before going to bed. *Id*.

Dr. Lechnyr found no indication of malingering or secondary gain, and opined that Vaughn's "psychiatric state is aggravating her organic pain issues." Tr. 424. Although Vaughn was able to sit through the entire interview, she appeared physically uncomfortable at times and occasionally lost her train of thought. Tr. 425. On testing, Vaughn demonstrated a severe level of anxiety on the Burns Anxiety Inventory, and moderate depression on the Burns Depression Inventory. *Id*. Dr. Lechnyr diagnosed PTSD and mood disorder, not otherwise specified, and assigned a Global Assessment of Functioning ("GAF") score of 54. Tr. 427. Dr. Lechnyr recommended Vaughn undergo mental health counseling to learn cognitive strategies for managing her fibromyalgia. Tr. 428.

In mid-August 2011, Vaughn returned to Dr. Albanese, reporting recently experiencing a "significant flare up" where she could hardly walk. Tr. 383. Vaughn reported continuing pain radiating "up and down her back and in her arms and legs." *Id*. She also described that her pain levels worsened with increased physical activity, but improved with rest, massage therapy, and stretching. *Id*. Dr. Albanese counseled Vaughn on pain management strategies, recommending that Vaughn remain as active as possible, and prescribed Tramadol for severe flare-ups. *Id*.

Vaughn attended two mental health counseling sessions with Dr. Lechnyr in December

2011.  Tr. 429-34.  She reported being in a recent motor vehicle accident in which she was a passenger.  Tr. 432.  Dr. Lechnyr found that "[d]ue to the complex interplay of psychiatric and physical symptoms, a multi-disciplinary approach is warranted."  Tr. 433.  Dr. Lechnyr renewed Vaughn's psychiatric referral, opining that Vaughn would likely benefit from seeing a specialist in mood medication.  *Id*.[3]

In early January 2012, Vaughn returned to Dr. Albanese, reporting an exacerbation of her symptoms following the motor vehicle accident a month earlier.  Tr. 472.  She was experiencing "numbness and tingling through the distal arms and legs especially with walking or using her hands."  *Id*.  Prior to the accident, she had been walking at a track up to a mile each day, building her tolerance for swimming, and practicing yoga; however, after the accident, she was able to go only twice due to exacerbation of symptoms "throughout her whole body."  *Id*.  She was looking into medicinal cannabis for treatment.  *Id*.  On examination, Dr. Albanese noted tenderness to palpation at all 18 fibromyalgia tender points.  Tr. 473.  In response to Vaughn's reports of mood swings and "the possibility for bipolar," Dr. Albanese ordered a gradual taper off of Cymbalta.  Tr. 474.  Due to Vaughn's increased reflexes and positive Hoffman's sign, Dr. Albanese ordered a brain MRI to rule out any contributing pathology.  *Id*.  Subsequent interpretation of the brain MRI indicated normal findings.  Tr. 466.

In late February 2012, Vaughn reported to Dr. Albanese that she increased her activity level and was walking a half-mile on a regular basis.  Tr. 443.  She requested to stop taking Cymbalta, describing difficulty concentrating, even on a reduced dose.  *Id.*  Dr. Albanese ordered Vaughn to discontinue Cymbalta and prescribed a trial of Neurontin.  Tr. 444.  She also

---

[3]  After December 2011, Vaughn attended at least 19 additional counseling sessions with Dr. Lechnyr.  *See, e.g.*, Tr. 476-93, 534-79.  Because disposition of this case does not turn on the findings by Dr. Lechnyr, this court discusses those records only sparingly.

recommended Vaughn maintain her activity level and continue attending pain psychology therapy. *Id.*

On August 30, 2012, Vaughn established care with Michelle Kaplan, M.D. Tr. 515-17. Vaughn was "kinda stressed" and using a rescue inhaler about every three days. Tr. 515-16. Her pain was being managed by Dr. Albanese, and Vaughn was planning to establish care with a new psychosomatic therapist. Tr. 515.

At a follow-up appointment with Dr. Albanese in October 2012, Vaughn reported pain levels ranging from three to nine out of ten, experiencing increased stamina after losing twenty-pounds, and using medical cannabis on a regular basis. Tr. 529. She also stated that she was looking to find employment and inquired about "how to go about ramping up her activities." *Id.* Dr. Albanese recommended she start gradually increasing her activity by volunteering before pursuing employment. Tr. 530. Also in October, after a five-month break from counseling, Vaughn returned to Dr. Lechnyr due to "new stressors." Tr. 571; *see also* Tr. 534, 574. A few weeks later, in November 2012, Vaughn reported looking for a volunteer position to help improve her mood and endurance. Tr. 566. Dr. Lechnyr opined that Vaughn "appears to be medically disabled by her condition, her symptoms and diagnoses have been consistent across time, and she does not demonstrate malingering." *Id.* Dr. Lechnyr also readministered psychometric testing and noted positive progress in regards to Vaughn's depression, anxiety, and pain experience. Tr. 568.

Four months later, in February 2013, Vaughn informed Dr. Albanese that despite experiencing more pain during the colder months she was walking up to a mile every day. Tr. 526. She had lost 24 pounds since July, was doing some swimming, and participating in Weight Watchers. *Id.* She was often unable to get out of bed in the morning, but was able to

take on the occasional dog walking job. *Id.* Due to Vaughn's report that Tramadol was becoming less effective, Dr. Albanese recommended a double dose for "more severe flare-ups." Tr. 527.

Dr. Albanese completed an assessment of Vaughn's functional capacity on February 13, 2013. Tr. 501-505. Dr. Albanese had seen Vaughn on seven occasions for treatment of fibromyalgia and anxiety. Tr. 501. Dr. Albanese found that Vaughn met the American College of Rheumatology criterion for a diagnosis of fibromyalgia, and expected her physiological, mental, and emotional impairments to remain about the same over time. Tr. 501, 505. She opined that Vaughn could work at the light and sedentary levels of exertion, but would need a reduced pace if working at the medium level of exertion. *Id.* However, Vaughn could rarely lift any weights, even less than 20 pounds, and could never lift more than 50 pounds. Tr. 504. Vaughn could sit or stand for at least six hours in an eight-hour work day with breaks, but only for an hour at a time and she would need the flexibility to walk for an hour, in ten-minute increments, each day. Tr. 503-04. She would also require the freedom to shift between sitting, standing, and walking at will, and would need daily, unscheduled breaks of five to ten minutes in duration to lie down or sit quietly. Tr. 504. Dr. Albanese noted that Vaughn periodically experienced pain severe enough to interfere with attention and concentration. Tr. 503. She opined that Vaughn would have "good days and bad days," and the bad days would likely cause her to be absent from work in excess of ten times per month. Tr. 505.

At a June 2013, appointment with Dr. Kaplan, Vaughn endorsed increased anxiety and panic attacks. Tr. 683. Dr. Kaplan prescribed Xanax for severe panic attacks and Propranolol for less severe episodes. *Id.* Later that month, Vaughn reported Propranolol was ineffective and

she was reluctant to take Xanax due to previous experiences with negative side-effects.  Tr. 681.

Dr. Kaplan switched her prescription to Effexor.  Tr. 682.

Vaughn suffered an injury to her left hip in July 2013 after she fell off a chair she was standing on to fix her window blinds.  Tr. 679, 685.  Initially, she presented to the emergency department and was noted to have a limp and tenderness in her back and buttocks.  Tr. 685.  She was given a Toradol injection which gave significant relief.  Tr. 686.  On discharge, she was prescribed Oxycodone and Diazepam and referred to physical therapy.  *Id.*  Vaughn attended a total of six physical therapy sessions, which concluded in September 2013 after she experienced significant improvement and all of her treatment goals were met.  Tr. 584-96.

In September 2013, Vaughn learned she was pregnant and sought Dr. Kaplan's advice on her medication regimen.  Tr. 674.  She reported that she was already taking less Oxycodone because physical therapy had "really helped her pain."  *Id.*  Dr. Kaplan discussed the pros and cons of using anti-depressants during pregnancy, and Vaughn elected to taper off Effexor and cease taking her prescription pain medications.  Tr. 675.  The following month, Vaughn reported to Melanie Konradi, M.D., that she had stopped all medication with the exception of some medical cannabis use.  Tr. 599.  Dr. Konradi advised that she decrease her cannabis use near term to ensure her baby was not exposed through breast milk.  Tr. 560.

One month after she delivered her baby, in May 2014, Vaughn sought Dr. Kaplan's advice on which medication she could take while breast feeding.  Tr. 669.  She reported that her back pain was minimal during her pregnancy, but increased after she gave birth.  *Id.*  On examination, Dr. Kaplan noted some muscle spasms, but no tenderness to palpation, a negative straight leg test, and normal strength and sensation.  Tr. 670.  The doctor recommended she treat her pain symptoms with massage, stretching, acupuncture, and physical therapy, and prescribed

Tramadol with the instruction that she use it only sparingly.  *Id.*  The following month, Vaughn reported to Dr. Konradi that her fibromyalgia was "back with a vengeance," and inquired about the use of Estriol for treatment.  Tr. 661.  Dr. Konradi stated that she was unfamiliar with Estriol and recommended Vaughn pursue such treatment through a rheumatologist.  Tr. 659.

Vaughn returned to Dr. Kaplan in February 2015 and requested refills of Percocet and Xanax because she was "losing her double insurance coverage very soon."  Tr. 663.  In refilling Vaughn's prescriptions, Dr. Kaplan noted her very infrequent use of both medications.  *Id.* Specifically, Vaughn made ten tablets of Percocet last about seven months and five tablets of Xanax last more than a year.  *Id.*

In August 2015, four months before the second hearing was held, Vaughn established care with Celeste Walker, M.A., for the purpose of restarting mental health counseling.  Tr. 688-98.  Walker diagnosed generalized anxiety disorder, panic disorder with agoraphobia, and PTSD, and she assigned a GAF score of 45.  Tr. 690.  However, Walker noted in a form provided by Vaughn's attorney that she did not have enough information to assess Vaughn's functional limitations and never administered a mental status test.  Tr. 760, 763.

## DISCUSSION

Vaughn argues the ALJ erred by: (1) failing to give clear and convincing reasons for discrediting her symptom testimony; (2) failing to provide legally sufficient grounds for discounting the opinions of Drs. Albanese and Lechnyr; and (3) failing to provide sufficiently germane reasons for giving partial weight to the lay witness statements of Vaughn's mother, Sandra Vaughn, and husband, Brendon Kaiser.  This court concludes that the ALJ erred in discounting the testimony of Vaughn and Dr. Albanese, and that properly crediting that testimony mandates an award of benefits.  Accordingly, this court expresses no views on the remaining issues raised by the parties.

## I.     Vaughn's Symptom Testimony

### A.     Legal Standard

The Ninth Circuit has developed a two-step process for evaluating the claimant's symptom testimony. *Vasquez v. Astrue,* 572 F.3d 586, 591 (9th Cir. 2009). First, the ALJ "must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Lingenfelter,* 504 F.3d at 1036. When doing so, the claimant "need not show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom." *Smolen v. Chater,* 80 F.3d 1273, 1282 (9th Cir. 1996).

Second, "if the claimant meets the first test, and there is no evidence of malingering, "'the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so.'" *Lingenfelter,* 504 F.3d at 1036 (quoting *Smolen,* 80 F.3d at 1281). "This is not an easy requirement to meet." *Garrison*, 759 F.3d at 1015. "The clear and convincing standard is the most demanding required in Social Security cases." *Id.* (quoting *Moore v. Comm'r of Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)). It is "not sufficient for the ALJ to make only general findings; [the ALJ] must state which pain testimony is not credible and what evidence suggests the complaints are not credible." *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993). Those reasons must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995) (citing *Bunnell v. Sullivan*, 947 F.2d 341, 345-46 (9th Cir. 1991) (*en banc*)).

The ALJ's decision to discount the claimant's subjective symptom testimony may be upheld overall even if not all of the ALJ's reasons are upheld. *See Batson v. Comm'r of Soc. Sec. Admin.,* 359 F.3d 1190, 1197 (9th Cir. 2004). The ALJ may not, however, make a negative credibility finding "solely because" the claimant's symptom testimony "is not substantiated affirmatively by objective medical evidence." *Robbins v. Soc. Sec. Admin.,* 466 F3d 880, 883 (9th Cir. 2006).

## B.    Analysis

Vaughn assigns several errors to the ALJ's assessment of her subjective symptom testimony. Because there was no evidence of malingering, the ALJ was required to provide clear and convincing reasons for finding Vaughn less than fully credible. Here, the ALJ provided four reasons for doing so: (1) she received only conservative treatment; (2) her ability to care for a newborn child undermined her alleged limitations; (3) her poor work history, expressed fear of losing nutrition assistance benefits, and financial support from her family suggested that she lacked motivation to work; and (4) her alleged limitations were unsupported by the objective medical evidence. Tr. 23-24.

The ALJ found that Vaughn's "treatment records reveal[ed that she] received routine, conservative and non-emergency treatment since the alleged onset date." Tr. 23. "[E]vidence of 'conservative treatment' is sufficient to discount a claimant's testimony regarding severity of an impairment." *Parra*, 481 F.3d at 750 (quoting *Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th Cir. 1995)). Vaughn argues that in making this finding the ALJ "essentially require[d] evidence that [she] underwent treatment not available to fibromyalgia patients." Pl.'s Br. 12, ECF #15.

The Ninth circuit has previously noted that "[f]ibromyalgia's cause is unknown, there is no cure, and it is poorly understood within much of the medical community." *Benecke v.*

*Barnhart*, 379 F.3d 587, 590 (9th Cir. 2004). The American College of Rheumatology also notes that although there is no cure for fibromyalgia, "symptoms can be treated with both non-drug and medication based treatments."[4] Non-drug therapies include low-impact physical exercise, cognitive behavioral therapy, acupuncture, massage, and management of any underlying stress, anxiety, panic disorder, and depression. The record shows Vaughn engaged in nearly all of these courses of treatment. *See, e.g.*, Tr. 383 (Dr. Albanese recommended Vaughn remain as active as possible), 388 (Cymbalta, Voltaren gel, and a TENS unit prescribed), 472 (Vaughn reported walking, swimming, and practicing yoga for exercise), 476-93 (attended cognitive behavioral therapy sessions with Dr. Lechnyr), 534-79 (same), 687-98 (mental health counseling for anxiety, panic disorder, PTSD, and depression). Therefore, Vaughn's fibromyalgia treatment was appropriate, not conservative.

Further, there is no evidence that Vaughn did not follow her recommended course of treatment, nor does it appear that less conservative treatment was available. For example, in June 2011, Dr. Noonan found no need for surgical intervention after reviewing Vaughn's MRIs. Tr. 359. Because "the record does not reflect that more aggressive treatment options [were] appropriate or available," it would be illogical to discredit Vaughn "for failing to pursue non-conservative treatment options where none exist." *See Lapeirre-Gutt v. Astrue*, 382 Fed. App'x 662, 664 (9th Cir. 2010); *see also Revels v. Berryhill,* 874 F.3d 648, 667 (9th Cir. 2017) ("Any evaluation of the aggressiveness of a treatment regimen must take into account the condition being treated"). Accordingly, the ALJ's characterization of Vaughn's treatment as

---

[4] *See* American College of Rheumatology, *Fibromyalgia*, https://www.rheumatolog y.org/I-Am-A/Patient-Caregiver/Diseases-Conditions/Fibromyalgia (last visited Feb. 9, 2018).

"conservative" is not supported by substantial evidence and does not suffice as a clear and convincing reason for finding her symptom testimony less than entirely credible.

Second, the ALJ found that "[a]lthough [Vaughn] claims she is limited, the care of a young child can be quite demanding both physically and emotionally, indicating that her level of functioning is greater than characterized." Tr. 24. An ALJ may discount a claimant's testimony if it is inconsistent with the claimant's activities of daily living, or if the claimant's participation in everyday activities indicates capacities that are transferrable to a work setting. *Molina v. Astrue*, 674 F.3d 1104, 1112–13 (9th Cir. 2012); *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007). A claimant, however, need not be utterly incapacitated to receive disability benefits, and sporadic completion of minimal activities is insufficient to support a negative credibility finding. *Vertigan v. Halter,* 260 F.3d 1044, 1050 (9th Cir. 2001); *see also Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998) (requiring the level of activity to be inconsistent with the claimant's alleged limitations to be relevant to his or her credibility).

As the Ninth Circuit recently reiterated, "'many home activities are not easily transferable to what may be the more grueling environment of the workplace, where it might be impossible to periodically rest or take medication.'" *Trevizo v. Berryhill*, 871 F.3d 664, 682 (9th Cir. 2017) (quoting *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)). Here, the ALJ did not provide any findings or explanation as to how Vaughn's ability to care for her child indicated capacities that are transferrable to a work setting. Tr. 23-24. Moreover, the ALJ's determination that she was the primary caretaker of her child because Vaughn indicated that her husband "works a lot," fails to account for the fact that Vaughn also testified that she was able to care for her child despite her impairments because she received significant help from family and friends. Tr. 23, 92-93. Beyond Vaughn's testimony that she was able to care for her infant with the

support of others and by modifying her activities to accommodate her pain levels, there is no additional information in the record about her childcare activities. Thus, "the mere fact that she cares for [a] small child[] does not constitute an adequately specific conflict with her reported limitations." *Trevizo*, 871 F.3d at 682. Because Vaughn's ability to care for her child was wholly consistent with her testimony and did not indicate capacities transferrable to the workplace, the ALJ's finding was erroneous.

Third, the ALJ found that, taken together, Vaughn's expressed concern about losing her nutrition assistance benefits if she started taking online college classes, insignificant work history prior to the alleged onset date, and receipt of financial support from her family suggested "that she is not highly motivated to attempt to work within her limitations." Tr. 24. When evaluating a claimant's symptom testimony, an ALJ may consider evidence of secondary gain. *See Matney ex rel. Matney v. Sullivan*, 981 F.2d 1016, 1020 (9th Cir. 1992). Such evidence raises the inference that a claimant's alleged inability to work is due to factors unrelated to disability. Here, however, Vaughn did not testify that she did not seek employment because she would lose her nutrition assistance benefits; rather, she testified that she could not attend college courses because in order to remain eligible for food stamps she had to certify that she was able to work at least 26 hours a week—a representation she was unwilling to make given her impairments. Tr. 49-51. Essentially, because Vaughn had to certify she could work in order to attend college courses *and* receive nutrition benefits, she was faced with the choice of either pursuing a higher education or keeping food on the table. The ALJ's reasoning erroneously faults her for choosing the latter. Consequently, Vaughn's testimony related to her concern about losing food stamp benefits does not amount to evidence of secondary gain, and was not a clear and convincing reason for discounting her testimony.

In evaluating symptom testimony, an ALJ may also consider whether a claimant had a poor work history prior to her alleged disability onset date. *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002). Vaughn's limited work history, however, is predominantly due to her young age, not a lack in motivation as speculated by the ALJ. After graduating from high school, Vaughn moved away from her home in Eugene, Oregon to begin classes at Portland Community College. Tr. 49. She attended a total of three semesters before returning home in early 2010. *Id.* Shortly thereafter, she worked a part-time position with the City of Eugene as a youth recreational leader. Tr. 302. When Vaughn alleged she became disabled and stopped working in January 2011, she was only 21 years old. Tr. 53, 278. The record indicates that for much of the brief period of time between graduating from high school and her alleged onset date, Vaughn was either in college or working. Therefore, while the ALJ's finding that Vaughn "had no significant work history prior to her alleged onset date" was factually accurate, the ALJ's inference that Vaughn lacked motivation was not supported by substantial evidence in the record.

As to Vaughn's receipt of financial support from her family, the Commissioner argues that "[a]n ALJ may consider evidence indicative of a poor motivation to work, such as financial reserves or resources." Def.'s Br. 9, ECF #16 (citing *Tommasetti*, 533 F.3d at 1040). At the second hearing, Vaughn testified that the house she lived in was purchased by her parents, who charged a monthly rent that Vaughn and her husband could afford on his income alone. Tr. 99-100. However, the ALJ's conclusory assertion that this fact suggested Vaughn lacked motivation is contradicted by the record. For example, in October 2012, Vaughn expressed a desire to work and asked Dr. Albanese how she could structure her pain rehabilitation toward that goal. Tr. 529. Dr. Albanese recommended she start with a volunteer position and increase her hours as her pain allowed. Tr. 530. Following her doctor's advice, Vaughn attempted to

volunteer reading to children at an elementary school, but was unable to make it to most of her shifts due to fibromyalgia flare-ups. Tr. 64-65. Vaughn's desire and attempt to return to the workforce does not evince a lack of motivation to work.

Furthermore, the Commissioner's reliance on *Tommasetti* is misplaced. In *Tommasetti*, the Ninth Circuit upheld an adverse credibility determination based, in part, on the ALJ's finding that the claimant "may not have been motivated to work due to his then large financial reserve [of $97,000]." *Tommasetti*, 533 F.3d at 1040. Here, unlike *Tommasetti*, there is no evidence that Vaughn had a "large financial reserve" at her disposal. Nor does the ALJ explain how the unspecified amount of financial support that Vaughn received from her parents in the form of reduced rent has any bearing on her motivation to work. On balance, the ALJ's inference that Vaughn lacked motivation was unsupported by substantial evidence.

Finally, the ALJ found the full extent of Vaughn's symptom testimony unsupported by the objective medical evidence. Tr. 24. Specifically, the ALJ noted that Vaughn's "initial presentation at the time of the alleged onset date was for acute onset spinal pain with imaging studies showing no more than minimal degeneration." *Id.* The ALJ's rationale is problematic for several reasons. To begin, the imaging studies cited by the ALJ were taken before Vaughn was diagnosed with fibromyalgia. Given the complexities of the disease, the Agency's guidance notes that "it is common in cases involving fibromyalgia to find evidence of examinations and testing that rule out other disorders that could account for the person's symptoms and signs." Social Security Ruling ("SSR") 12-2p, *available at* 2012 WL 3104869, at *3 (July 25, 2012). In finding Vaughn's symptom testimony relating to her fibromyalgia was unsupported by the medical evidence, the ALJ "effectively require[ed] 'objective' evidence for a disease that eludes

such measurement." *Benecke*, 379 F.3d at 594 (quoting *Green-Younger v. Barnhart*, 335 F.3d 99, 108 (2d Cir. 2003)).

Moreover, subjective pain testimony can be rejected on the basis that it is unsupported by objective medical evidence so long as that is not the *sole* ground evoked by the ALJ. *See Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001). As discussed above, the other reasons provided by the ALJ for discrediting Vaughn's pain testimony do not pass legal muster. In sum, the ALJ erred in her treatment of Vaughn's subjective symptom testimony by failing to provide sufficiently clear and convincing reasons for finding Vaughn less than entirely credible.

## II.     Medical Opinion Evidence

Vaughn also argues the ALJ failed to provide legally sufficient reasons for not fully crediting the opinion of Dr. Albanese, Vaughn's treating physiatrist.

### A.     Legal Standard

The Commissioner "must consider all medical opinion evidence." *Tommasetti*, 533 F.3d at 1040 (citation omitted). In doing so, the Commissioner "is responsible for resolving conflicts in the medical record." *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1164 (9th Cir. 2008) (citation omitted). Those medical providers "with the most significant clinical relationship with the claimant are generally entitled to more weight than those . . . with lesser relationships." *Id.* (citations omitted). The Ninth Circuit distinguishes between the opinions of three types of physicians: treating physicians, examining physicians, and non-examining physicians. *Garrison*, 759 F.3d at 1012 (citation omitted).

The "medical opinion of a claimant's treating doctor is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record.'" *Revels*,

874 F.3d at 654 (quoting 20 CFR § 404.1527(c)(2)); *see also* 20 CFR § 416.927(c)(2).  If not

"controlling," the treating doctor's opinion "is weighted according to factors such as the length

of the treatment relationship and the frequency of examination, the nature and extent of the

treatment relationship, supportability, and consistency with the record."  *Revels*, 874 F.3d at 654

(citations omitted).  Greater weight is "given to the 'opinion of a specialist about medical issues

related to his or her area of specialty.'"  *Id.* (quoting 20 CFR § 404.1527(c)(5)); *see also* 20 CFR

§ 416.927(c)(5).  Furthermore, a "doctor's specialty is especially relevant with respect to

diseases that are 'poorly understood' within the rest of the medical community."  *Revels*, 874

F.3d at 654 (quoting *Benecke*, 379 F.3d at 594 n.4).

The Commissioner "may only reject a treating or examining physician's uncontradicted

medical opinion based on 'clear and convincing reasons.'"  *Carmickle*, 533 F.3d at 1164

(quoting *Lester v. Chater*, 81 F.3d 821, 830-31 (9th Cir. 1995)).  Where such an opinion is

contradicted, it may only be rejected if the Commissioner provides "specific and legitimate

reasons that are supported by substantial evidence."  *Revels*, 874 F.3d at 654 (quoting *Ryan v.

Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008)).  "Substantial evidence means more

than a mere scintilla, but less than a preponderance.  It means such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion."  *Trevizo*, 871 F.3d at 674

(quoting *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573, 576 (9th Cir. 1988)).  In

the context of medical evidence, "[t]he opinion of a nonexamining physician cannot by itself

constitute substantial evidence that justifies the rejection of the opinion of either an examining

physician or a treating physician."  *Revels*, 874 F.3d at 655 (quoting *Lester*, 81 F.3d at 831)

(emphasis omitted).

Specific, legitimate reasons for rejecting a physician's opinion may include its reliance on a claimant's properly discredited subjective complaints, inconsistency with medical records or the claimant's testimony or activities of daily living, or internal inconsistencies. *Tommasetti*, 533 F.3d at 1041; *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 601-03 (9th Cir. 1999); *Andrews v. Shalala*, 53 F.3d 1035, 1042-43 (9th Cir. 1995). An ALJ must identify the relative weight a medical opinion is accorded in a written decision, and if an ALJ chooses to reject "significant probative evidence," the ALJ must provide legally sufficient rationales. 20 CFR § 416.927(c)(2); *Flores v. Shalala*, 49 F.3d 562, 570-71 (9th Cir. 1995) (quoting *Vincent v. Heckler*, 739 F.2d 1393, 1394-95 (9th Cir. 1984)).

B.      Analysis

Dr. Albanese's opinion was contradicted by the opinion of State agency reviewing physician, Neal Berner, M.D. Tr. 135-38, 145-48. Therefore, the ALJ needed to provide only specific and legitimate reasons for giving "partial weight" to Dr. Albanese's opinion. Tr. 27. Here, the ALJ gave several reasons for doing so, but none of those reasons withstands scrutiny.

The ALJ found Dr. Albanese's opinion was internally inconsistent because the doctor "indicated that [Vaughn] should have no difficulty sustaining sedentary or light work on page one, but a few pages later, Dr. Albanese stated that [Vaughn] could rarely lift/carry any weight and that [she] was likely to be absent excessively." Tr. 27; *see also* Tr. 501-505. The discrepancy between Dr. Albanese's assessment that Vaughn could perform work at the light and sedentary levels and her opinion that Vaughn could rarely lift or carry any weight is consistent with the doctor's apparent unfamiliarity with the Agency's specialized definitions of "light" and

"sedentary" work.  *See* SSR 83-10, *available at* 1983 WL 31251, at *5 (Jan. 1, 1983).[5]

Furthermore, the assessment form supplied to Dr. Albanese by Vaughn's attorney provided no

definition of those terms.  Tr. 501.  Without evidence of the meaning Dr. Albanese attributed to

"light" or "sedentary," the ALJ's assumption that the doctor's understanding was consistent with

the Agency's definitions was based purely on speculation, not substantial evidence.

Even more problematic is the ALJ's reliance on this ambiguous portion of Dr. Albanese's

assessment to find inconsistencies with the more specific, unambiguous portions of her opinion.

While it is uncertain what Dr. Albanese envisioned light or sedentary work to involve, her

opinion that Vaughn should "rarely"—*i.e.*, "0 to 5% of the workday"—lift any weight up to 20

pounds, and never lift any weight over 50 pounds, was entirely clear.  Tr. 504.  Essentially, by

attributing the Agency's understanding of the terms "light" and "sedentary" to Dr. Albanese's

opinion, the ALJ manufactured a conflict, which she then impermissibly used as a basis for

discounting the doctor's opinion.

Similarly, Dr. Albanese's opinion that Vaughn could sustain fulltime work "8 hours a

day, 5 days per week" at the light or sedentary levels was not inconsistent with her later opinion

that Vaughn would likely be absent from work "more than ten times a month."  Tr. 501, 505.

Read in context, Dr. Albanese's opinion that Vaughn could sustain fulltime work was premised

on the caveat that she would also likely miss a substantial amount of work each month due to a

fluctuation of "good days" and "bad days."  *Id.*  In other words, Dr. Albanese opined that on her

"good days" Vaughn would be able to work a full time light or sedentary job, but on her "bad

_____

[5] "Sedentary work" involves "lifting no more than 10 pounds at a time . . . walking and standing
are required occasionally."  "Light work" involves "lifting no more than 20 pounds at a time
with frequent lifting or carrying of objects weighing up to 10 pounds . . . standing or walking
[for] approximately 6 hours in an 8-hour workday."  SSR 83-10, at *5-6.

days" she would not be able to attend work at all.  This is the only rational interpretation of the doctor's opinion, as it gives meaning to the entirety of the assessment and does not presuppose Dr. Albanese is so incompetent that she cannot provide an accurate opinion of her patient's limitations from one page to the next.  *See* Antonin Scalia and Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 167 (2012) (Under the "whole-text" canon of interpretation, if practicable, a text should be read in a manner that gives meaning to every part, and "[c]ontext is a primary determinant of meaning").  This interpretation of Dr. Albanese's opinion is also consistent with the Commissioner's own understanding of fibromyalgia.  *See* SSR 12-2p, at *6 ("[T]he symptoms of [fibromyalgia] can wax and wane so that a person may have 'bad days and good days").  Consequently, the ALJ's flawed finding that Dr. Albanese's report was internally inconsistent did not suffice as a specific and legitimate reason for giving less weight to the doctor's opinion.

Next, the ALJ gave limited weight to Dr. Albanese's opinion because "she met with [Vaughn] infrequently after her initial evaluation . . . so she did not have an opportunity to develop a full picture of [Vaughn's] functioning."  Tr. 27.  In evaluating medical opinion evidence, an ALJ should look to the "length of the treatment relationship and the frequency of examination."  20 CFR §§ 404.1527(c)(2)(i), 416.927(c)(2)(i).  Dr. Albanese treated Vaughn in June, July, and August 2011; January, February, and October 2012; and February 2013.  Tr. 383, 385, 387, 443, 472, 526, 529.  Over the course of Vaughn's treatment, Dr. Albanese ordered several laboratory and imaging studies, referred Vaughn to Dr. Lechnyr for pain treatment and reviewed the psychologist's treatment notes, prescribed numerous medication, and conducted several physical examinations.  *See*, *e.g.*, *id.*; Tr. 421, 434, 446-471, 490, 547, 565, 579.  In fact, Dr. Albanese had the most extensive treatment relationship with Vaughn for her fibromyalgia of

any physician of record. As such, the ALJ's assertion that Dr. Albanese "did not have an opportunity to develop a full picture of [Vaughn's] functioning" was unsupported by substantial evidence.

Moreover, based on the limitations incorporated in the RFC formulation, it appears the ALJ gave less weight to Dr. Albanese's opinion than she gave to the opinion of Dr. Berner, a non-examining medical source who never had the opportunity to observe Vaughn in person, much less develop a treatment relationship with her. Tr. 22, 28. In giving more weight to Dr. Berner, the ALJ failed to explain why Dr. Albanese's supposedly infrequent treatment of Vaughn undermined her opinion, but Dr. Berner's non-existent relationship with Vaughn was of no concern. *See* 20 CFR §§ 404.1527(c)(2)(i), 416.927(c)(2)(i) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion").

In a similar vein, the ALJ also discounted Dr. Albanese's opinion because Vaughn "did not continue treatment with Dr. Albanese following the initial hearing and she has not seen [Vaughn] since the birth of [her] child and is unaware of her ability to care for a newborn infant." Tr. 27. As discussed above, the ALJ failed to establish how Vaughn's ability to care for her child with the assistance of family and friends contradicted her symptom testimony. Dr. Albanese's opinion about Vaughn's limitations are consistent with those alleged by Vaughn, and Vaughn's limited ability to care for her infant has no bearing on Dr. Albanese's opinion. Moreover, the record does not indicate Vaughn experienced any meaningful degree of lasting symptom improvement after she ceased treatment with Dr. Albanese. Nor did the ALJ point to any probative evidence indicating a change in Vaughn's fibromyalgia that would call into question the degree to which Dr. Albanese's opinion was representative of Vaughn's condition at

the time of the second hearing. Accordingly, the fact that Dr. Albanese authored her report before Vaughn gave birth to her child was not a specific and legitimate rationale for discrediting the doctor's opinion.

The ALJ also found that "Dr. Albanese's treatment records, and the other substantial evidence of record, do not support the degree of limitation identified in [her] opinion." Tr. 27. Specifically, the ALJ stated that "[t]he medical evidence of record supports that [Vaughn] is more active than she alleged." *Id.* "A conflict between treatment notes and a treating provider's opinions may constitute an adequate reason to discredit the opinions of a treating physician or another treating provider." *Ghanim v. Colvin*, 763 F.3d 1154, 1161 (9th Cir. 2014) (citing *Molina*, 674 F.3d at 1111-12). Moreover, inconsistency between a treating provider's opinion and a claimant's daily activities can be a specific and legitimate reason to discount that opinion. *Id.* at 1162 (citing *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 600-02 (9th Cir. 1999)). Here, however, the ALJ neglected to explain with any specificity how Dr. Albanese's treatment records were inconsistent with her opinion. The ALJ also failed to provide any reasoning as to why Vaughn's daily activities indicated that she was more active than alleged. As such, the record reveals no grounds for upholding the ALJ's determination in this regard, and the reasons briefed by the Commissioner are merely post-hoc rationales that cannot form the basis for affirming the ALJ. *See Brown-Hunter v. Colvin*, 806 F.3d 487, 492 (9th Cir. 2015) (citing *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1054 (9th Cir.2006)) ("A clear statement of the agency's reasoning is necessary because [the Court] can affirm the agency's decision to deny benefits *only* on the grounds invoked by the agency") (emphasis added).

Finally, the ALJ discounted Dr. Albanese because, in arriving at her opinion, she "relied heavily on [Vaughn's] self-reporting," which the ALJ "found to be less than fully reliable." Tr.

27.  "An ALJ may reject a . . . physician's opinion if it is based 'to a large extent' on a claimant's self-reports that have been properly discounted as incredible."  *Tommasetti*, 533 F.3d at 1041 (quoting *Morgan*, 169 F.3d at 602)).  As discussed above, the ALJ's reasons for discounting Vaughn's subjective symptom testimony were not based on substantial evidence.  Accordingly, the ALJ's finding that Dr. Albanese's opinion merited less weight because the doctor relied on Vaughn's self-reporting also fails.  In sum, the ALJ did not provide sufficiently specific and legitimate reasons for discrediting Dr. Albanese's opinion.

## III.   Remand

When a court determines the Commissioner's ultimate disability decision includes legal error and/or is unsupported by substantial evidence, the court may affirm, modify, or reverse the decision by the Commissioner "with or without remanding the case for a rehearing."  42 USC § 405(g); *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1099 (9th Cir. 2014).  Here, the ALJ failed to provide legally adequate reasons to discredit both Vaughn's symptom testimony and the opinion of her treating physician, Dr. Albanese.

The Ninth Circuit's "credit-as-true" doctrine is settled and binding law.  *Garrison*, 759 F.3d 995.  "[T]he decision whether to remand for further proceedings turns upon the likely utility of such proceedings."  *Harman v. Apfel*, 211 F.3d 1172, 1179 (9th Cir. 2000) (citing *Lewin v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981)).  Under the doctrine, evidence is credited as true and an immediate payment of benefits is directed when: (1) the ALJ failed to provide legally sufficient reasons for rejecting evidence; (2) no outstanding issues must be resolved prior to a determination of disability; and (3) it is clear the ALJ would be required to find the claimant disabled if the evidence were credited.  *Benecke*, 379 F.3d at 593.

However, even if all the requirements are met, the Court may nevertheless remand for further proceedings "when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled" within the meaning of the Act, such as when there are inconsistencies between testimony and the medical record, or if "the government has pointed to evidence in the record that the ALJ overlooked" and explained how that evidence belies disability. *Dominguez v. Colvin*, 808 F.3d 403, 407-08 (9th Cir. 2015) (quoting *Burrell v. Colvin*, 775 F.3d 1133, 1141 (9th Cir. 2014)) (internal brackets and quotation marks omitted). Also, benefits may not be awarded punitively. *Strauss v. Comm'r of the Soc. Sec. Admin.*, 635 F.3d 1135, 1138 (9th Cir. 2011); *see also Dominguez*, 808 F.3d at 407-08 (summarizing the standard for determining the proper remedy).

As discussed above, the ALJ erred by failing to provide legally sufficient reasons, supported by substantial evidence, for disregarding both Vaughn's subjective symptom testimony, and Dr. Albanese's medical opinion. Thus, the first prong of the credit-as-true analysis is satisfied.

In arguing that further proceedings are warranted because there are outstanding issues that must be resolved, "[t]he Commissioner simply repeats all of the arguments she has already made, asserting that the evidence . . . should not be given much weight and that [Vaughn's] testimony should not be accepted." *Garrison*, 759 F.3d at 1022. Vaughn asserts she is entitled to a payment of benefits because if Dr. Albanese's assessment that she would miss more than 10 days of work a month and would need a daily, unscheduled work break was credited as true, a finding of disability would be required per the VE's testimony. Tr. 105-06, 501-05. Indeed, at the hearing, the VE testified that an individual, who, in addition to the restrictions incorporated in Vaughn's RFC, would miss only two workdays or more per month, or required a 15-minute

unscheduled break every other day, would not be employable.  Tr. 105-06.  Thus, it is clear on this record that a finding of disability would be required if Dr. Albanese's opinion had been properly credited.  Accordingly, the credit-as-true analysis mandates remand for an award of benefits.

## ORDER

For the reasons discussed above, the Commissioner's decision is REVERSED and REMANDED for immediate calculation and payment of benefits pursuant to sentence four of 42 USC § 405(g).

DATED this 12th day March, 2018.

/s/ Youlee Yim You
Youlee Yim You
United States Magistrate Judge